474 July 15, 2026 No. 665

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

JEFFREY ALLEN PITTMAN,
*Defendant-Respondent*
*Cross-Appellant.*

Multnomah County Circuit Court
23CR42210; A182752

Henry Kantor, Senior Judge.

Argued and submitted July 30, 2025.

Jon Zunkel-deCoursey, Assistant Attorney General, argued the cause for appellant-cross-respondent. Also on the opening brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General. Also on the reply brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Joshua B. Crowther, Chief Deputy Defender, argued the cause for respondent-cross-appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

SHORR, P. J.

Reversed and remanded on appeal; affirmed on cross-appeal.

**SHORR, P. J.**

The state appeals from a pretrial order granting defendant's motion to suppress evidence obtained as a result of a police seizure of defendant. In a single assignment of error, the state argues that the trial court erroneously concluded that the officer lacked reasonable suspicion to seize defendant. Defendant cross-assigns error to the trial court's decision not to suppress all evidence discovered pursuant to the inventory search of defendant's vehicle. Defendant also cross-appeals the trial court's denial of defendant's motion to suppress based on the officer's investigation of the truck's license plate. We conclude that the officer had reasonable suspicion to seize defendant. We further conclude that the trial court did not err in denying defendant's motion to suppress in the ways asserted by defendant. Accordingly, we reverse and remand on the state's appeal, reject defendant's cross-assignment of error, and affirm on defendant's cross-appeal.

We review a trial court's ruling on a motion to suppress for errors of law, and we are bound by the trial court's factual findings if there is constitutionally adequate evidence to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make express findings of fact on all pertinent issues, we "presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id.* But that presumption does not apply "[i]f an implicit factual finding is not necessary to a trial court's ultimate conclusion or is not supported by the record." *Pereida-Alba v. Coursey*, 356 Or 654, 671, 342 P3d 70 (2015).

While on routine patrol at around 8:30 p.m. on an evening in August, Officer Braun drove down a dead-end street in Portland that he knew to be a high crime area and "a hotspot for stolen cars." Because he patrolled that area frequently, Braun was familiar with the cars that belong to the residents. That evening, he noticed two vehicles he did not recognize—a Ford F-250 pickup truck and a Chevy Monte Carlo. The two vehicles were parked nose-to-nose with their hoods up and a set of jumper cables connecting them. Braun noticed defendant working in the engine

compartment area of the truck, and there were tools scattered on the ground. Braun ran the truck's license plate and learned that it had been reported stolen two days earlier. At that point, he intended to approach defendant but was called away on a higher priority dispatch call.

Just after midnight, Braun returned to the area with his partner. The vehicles were still parked in the same positions, but the Monte Carlo's hood was closed and the jumper cables were no longer in use. The officers parked behind the truck but did not block the road. Defendant and a woman, later identified as Alexander, were standing on the grass alongside the vehicles. Braun approached defendant, and his partner approached Alexander. Braun identified himself as police, said he needed to talk to defendant, and asked defendant to put down the heavy socket wrench he was holding. Defendant did not put the wrench down and asked, "What did I do?" He then reached inside the front passenger seat area of the Monte Carlo and slammed the door closed. Braun asked defendant to put the wrench down a second time. Defendant continued holding the wrench in his hand and was agitated. Braun asked what was going on with the two vehicles, to which defendant responded that he had not done anything wrong and the Monte Carlo was his car. He did not put down the wrench until both officers asked him to put it down, at which point he threw the wrench to the ground "about as hard as he could" and then started quickly walking in the opposite direction. Braun said he saw defendant working on the truck earlier. Defendant initially denied working on the truck, but then told Braun he was helping a friend. He refused to disclose the friend's name or location. The officers placed defendant under arrest. While searching defendant, Braun found defendant's ID, three credit cards with other people's names on them, and the title for the Monte Carlo. The officers also arrested Alexander after discovering a warrant for her arrest.

The officers continued investigating the truck and found a hole drilled next to the locking mechanism on the front passenger door, and the sound system inside the truck had been stripped. Pursuant to city policy, Braun conducted an inventory of the Monte Carlo. While doing so, he opened a

small earbud case and found two empty plastic baggies that contained some residue. He also found a handgun under the front passenger seat—the same area defendant had reached into during their earlier interaction.

The state charged defendant with felon in possession of a firearm, three counts of identity theft, possession of a stolen vehicle, and possession of loaded firearm in public. Defendant moved pretrial to suppress evidence gathered during the interaction, arguing that (1) Braun did not have reasonable suspicion to stop defendant the first or the second time Braun asked him to put down the wrench, (2) the officers did not have probable cause to arrest defendant, (3) the inventory of the Monte Carlo was unlawful, and (4) Braun conducted an unlawful search by running the truck's license plate. At the hearing on the motion, Braun was the sole witness. The trial court found Braun credible and accepted his factual testimony in all respects. At the close of the hearing, the trial court ruled on two parts of the motion. It denied the motion to suppress arising out of the search of the license plate. It granted the motion to suppress as to the opening of the earbud container and any evidence contained therein but ruled that that violation of the policy did not invalidate the entire inventory search. The court then issued an order in which it granted the motion to suppress based on lack of reasonable suspicion at the point that Braun first told defendant to drop the wrench. The court alternatively ruled that, if the stop did not occur until Braun and his partner repeated the request for defendant to drop the wrench, the motion to suppress would be denied at that point. The court also denied the motion to suppress evidence following the arrest, concluding that the officers had probable cause at the time of arrest.

We begin with the state's appeal, challenging the trial court's grant of defendant's suppression motion on the basis that Braun seized defendant without reasonable suspicion. The state does not dispute that a seizure occurred when Braun first asked defendant to drop the wrench but contends that Braun had reasonable suspicion to seize defendant at that point.

Article I, section 9, of the Oregon Constitution pro-
hibits "unreasonable" searches and seizures.[1] A "stop" is a
"kind of seizure of a person that is a temporary detention
for investigatory purposes." *State v. Maciel-Figueroa*, 361 Or
163, 169-70, 389 P3d 1121 (2017). An officer may lawfully
stop a person if the stop is supported by "reasonable sus-
picion." *Id.* at 170. The Supreme Court has articulated the
reasonable suspicion standard as follows:

> "For police officers to make a stop, they must reasonably
> suspect—based on specific and articulable facts—that the
> person committed a specific crime or type of crime or was
> about to commit a specific crime or type of crime. For a court
> to determine that an investigative stop was lawful under
> Article I, section 9, the court (1) must find that the officers
> actually suspected that the stopped person had committed
> a specific crime or type of crime, or was about to commit a
> specific crime or type of crime, and (2) must conclude, based
> on the record, that the officers' subjective belief—their sus-
> picion—was objectively reasonable under the totality of the
> circumstances existing at the time of the stop."

*Id.* at 182. The specific and articulated facts relied on by
the officer need not support certainty that the defendant
engaged in criminal activity, but rather, based on those
facts, "a reviewing court must conclude that the officer's
subjective belief *could* be true, as a matter of logic." *Id.* at
184 (emphasis in original). The possibility that there may
be noncriminal explanations for the facts observed does not
defeat reasonable suspicion. *State v. Brown*, 298 Or App 771,
775, 446 P3d 568, *rev den*, 365 Or 819 (2019). The state bears
the burden of establishing that the officer had both subjec-
tive and objective reasonable suspicion. *State v. Smith*, 308
Or App 84, 91, 479 P3d 553 (2020).

Here, the specific facts articulated by Braun sup-
ported a reasonable suspicion that defendant had commit-
ted the suspected crime of possession of a stolen vehicle.
Braun explained that the stolen truck was in a high crime

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable search, or seizure; and no
warrant shall issue but upon probable cause, supported by oath, or affirma-
tion, and particularly describing the place to be searched, and the person or
thing to be seized."

area known for stolen vehicles. He was familiar with the cars normally parked there and did not recognize the truck and car that defendant was working on. After running the truck's license plate, he discovered that it had been reported stolen two days earlier. When he returned to the area three and a half hours later at midnight, defendant was still working in the dark on the truck. He was apparently no longer trying to jump start the vehicle.

Braun also noticed a wire hanging down from the front bumper, which was an expensive aftermarket piece that had independent value and appeared to be in the process of being removed. The parties dispute whether Braun saw the bumper removal before or after he seized defendant. The parties point to two sections of the transcript where Braun discussed seeing parts hanging off the front bumper. In the first section, the prosecutor asked Braun to list every single factor contributing to reasonable suspicion as Braun was approaching defendant. In direct response to that question, Braun listed seeing parts hanging off the front bumper as one factor contributing to reasonable suspicion as he approached defendant.[2] In the second section, the prosecutor asked Braun when he saw defendant working on the front bumper of the truck. Braun clarified that he saw defendant working in the engine compartment of the truck when he first drove by at 8:30 p.m. Braun added that "in inspecting the vehicle more," he saw the front bumper looked like it was "partway through being removed." He also testified that at that point, he "was intending to arrest" defendant for possession of a stolen vehicle.

In those sections, Braun does not state that he saw the bumper being disassembled only after he seized defendant. Rather, in the first section, Braun testified that as he was approaching defendant and *before* he seized defendant, he saw the wire hanging from the front bumper and that contributed

_____

[2] Defendant argues that at this point, Braun was testifying about photo exhibits taken after defendant's arrest. Defendant is correct that Braun had been testifying about the contents of photographs. But then the prosecutor stated that he wanted "to go back a couple steps" and ask Braun about the factors contributing to reasonable suspicion as he approached defendant. Braun's testimony about seeing parts hanging off the front bumper was in direct response to the prosecutor's question about what factored into Braun's reasonable suspicion as he was "walking up and first interacting or seeing [defendant]."

to his reasonable suspicion. His testimony in the second section does not contradict his previous testimony—but rather merely states that at some point after he saw defendant working in the engine compartment at 8:30 p.m., he noticed the partial removal of the front bumper and intended to arrest defendant at that time. We are not persuaded that the record reflects that Braun first saw the front bumper being disassembled only immediately before he arrested defendant. The record supports that Braun saw the front bumper apparently in mid-disassembly before he seized defendant. Accordingly, that is a factor contributing to reasonable suspicion.

Nevertheless, even without the information about the bumper, we would conclude that, considering the other circumstances existing at the time of the stop, there was enough for reasonable suspicion. Although defendant initially appeared to be trying to jump start the truck, when Braun approached defendant over three hours later, the jumper cables were no longer attached, but defendant was still working on the truck in the dark with tools scattered around. Given the context—the length of time defendant was working on the truck, that it was after midnight, that the truck had been reported stolen and was in an area known for stolen vehicles—we do not agree with defendant that there was "nothing suspicious" about his conduct. Defendant's conduct, under the circumstances, was unusual and suspicious. Based on the specific and articulated facts, Braun's suspicion that defendant had committed the possession of a stolen vehicle "*could* be true, as a matter of logic," and was objectively reasonable. *Maciel-Figueroa*, 361 Or at 184. Although there are possible noncriminal explanations for defendant's behavior, that does not defeat reasonable suspicion. *Brown*, 298 Or App at 775. Braun was justified in conducting an investigation, at the time he asked defendant to drop the wrench, to determine whether his suspicion was founded, including temporarily detaining defendant for additional questioning. The trial court erred in granting defendant's motion to suppress on the basis that Braun lacked reasonable suspicion to seize defendant.

We turn next to defendant's cross-assignment of error, challenging the trial court's failure to suppress

evidence obtained from the inventory search. While conducting an inventory of the Monte Carlo, Braun opened a small earbud case, which contained two empty plastic baggies with some residue. Braun also found other items while inventorying the rest of the car, such as a handgun underneath the front passenger seat. The trial court suppressed the evidence found in the earbud case, concluding that Braun did not have the right to open that container without a warrant, but the court did not suppress the entirety of the inventory search. On appeal, defendant does not contend that the inventory policy itself was impermissible.[3] Rather, defendant argues that the officer's violation of the inventory policy by opening the closed container invalidated the entire inventory search, and therefore the trial court erred by not suppressing all the evidence discovered during the inventory search. In support of that argument, defendant relies on the Supreme Court's statement in *State v. Atkinson*, 298 Or 1, 10, 688 P2d 832 (1984), that if "the inventory deviated from the established policy or procedures of the particular law enforcement agency, the inventory should be deemed invalid." As we explain below, we do not agree that Article I, section 9, required suppression of the entire inventory search.

Article I, section 9, protects the rights of individuals against unreasonable government searches and seizures. Accordingly, evidence obtained in violation of that constitutional provision is subject to suppression under Oregon's exclusionary rule. *See State v. DeJong*, 368 Or 640, 647, 497 P3d 710 (2021) (providing that "the purpose of Oregon's exclusionary rule *** is to vindicate a defendant's personal right to be free from unreasonable searches and seizures"); *State v. Norton*, 270 Or App 584, 588, 349 P3d 576 (2015) (explaining that "the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if the government's officer's had stayed within the law" (internal quotation marks omitted)). However, a police inventory of property lawfully within police custody and conducted pursuant to certain requirements is not inherently unreasonable. *State v. Fulmer*, 366 Or 224, 231, 460 P3d 486 (2020).

---

[3] Defendant expressly does not cross-assign error to the issue of whether the inventory was impermissible.

In this case, the unlawful conduct occurred when Braun opened the small earbud container. The trial court concluded that Braun violated the inventory policy by doing so and suppressed the evidence found within the container. The trial court did not suppress the other evidence Braun discovered while conducting the inventory, such as the handgun. We conclude that the suppression of the evidence within the container restored defendant to the same position as if Braun had stayed within the law, which is what the exclusionary rule requires. *Norton*, 270 Or App at 588; *see also State v. Cruz-Renteria*, 250 Or App 585, 593, 280 P3d 1065 (2012) (concluding that the evidence discovered inside closed canisters should have been suppressed because the officer opened the canisters in violation of inventory policy). The exclusionary rule does not require suppression of lawfully obtained evidence, such as evidence obtained pursuant to a valid inventory. Defendant does not appear to argue on appeal that the remainder of the inventory search violated his rights. Nor does defendant contend that the discovery of any evidence, such as the handgun, derived from or was a product of the officer's unlawful conduct—in this case, the opening of the earbud case. *See State v. Wagner*, 339 Or App 1, 5, 566 P3d 1241 (2025) (evidence need not be suppressed if the "unlawful police conduct cannot be properly viewed as the source of that evidence"). Furthermore, we do not agree with defendant that *Atkinson*, which did not address the issue, requires the suppression of an entire inventory search where the police unlawfully opened a single container. *Atkinson* considered whether a vehicle had been improperly impounded and searched pursuant to an inventory policy permissible under Article I, section 9. 298 Or at 11. Here, as noted, there is no contention that the policy was improper, but rather defendant contends that the officer's opening of the earbud container violated the policy. The trial court did not err by suppressing only the contents of the improperly opened earbud container. It did not have to suppress all of the evidence discovered during the inventory.

Finally, we turn to defendant's cross-appeal. Defendant assigns error to the trial court's denial of his motion to suppress evidence obtained after Braun ran the license plate of the truck, arguing that by doing so, the

officer violated Article I, sections 9 and 20, of the Oregon Constitution. The trial court denied the motion, relying on *State v. Davis*, 237 Or App 351, 355-61, 239 P3d 1002 (2010), *aff'd by an equally divided court*, 353 Or 166 (2013), in which we held that a law enforcement officer's license plate check did not violate Article I, section 9, or Article I, section 20.

         At the outset, we note that defendant has not identified any privacy or possessory interest in the truck, which he did not own. *See State v. Voyles*, 280 Or App 579, 584, 382 P3d 583, *rev den*, 360 Or 751 (2016) (examination of property is not a search protected under Article I, section 9 if the defendant has no protected privacy or possessory interest in the property). However, even assuming that defendant had such an interest, we agree with the trial court that *Davis* controls. We decline to overrule *Davis*, as defendant urges us to do, because defendant has not persuaded us that *Davis* is "plainly wrong," as he must for us to overrule that existing precedent. *State v. Civil*, 283 Or App 395, 406, 388 P3d 1185 (2017) (we will only overturn precedent where it is "'plainly wrong,' a rigorous standard grounded in presumptive fidelity to *stare decisis*"); *State v. Brown*, 306 Or App 652, 653, 473 P3d 1164 (2020) (rejecting a similar request to overrule *Davis*). Accordingly, we conclude that the trial court did not err in denying defendant's suppression motion based on the license plate check.

         Reversed and remanded on appeal; affirmed on cross-appeal.